UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
:
UNITED STATES OF AMERICA            :
                                    :          Criminal No. 04-493 (JAP)
                                    :
         v.                         :          **OPINION**
                                    :
                                    :
KEVIN FLINT MCCRAY                  :
                                    :
_____:

         Subsequent to a competency hearing held on July 26, 2005, this Court found Defendant,

Kevin McCray, to be suffering from a mental disease or defect rendering him incompetent to

stand trial on the criminal charges against him.  The Court ordered that Defendant be hospitalized

in order to determine whether there existed a substantial probability that Defendant would be

restored to competency in the foreseeable future.  After several months of evaluation, doctors

concluded that there was a substantial likelihood that Defendant could be restored to competency

through treatment with antipsychotic medication.  However, Defendant has refused all medical

treatment.  The United States now seeks an order that would permit the Bureau of Prisons to

forcibly administer antipsychotic medication to Defendant in order to restore his competency and

allow him to stand trial.  For the reasons set forth below, the government's motion is denied.

I.  Background

         Defendant presently stands charged in a five-count indictment returned August 12, 2004,

with one count of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. 1951(a),

three acts of Hobbs Act robbery in violation of 18 U.S.C. 1951(a), and one count of using a firearm during the commission of a crime of violence in violation of 18 U.S.C. 924(c)(1).  The charges stem from the robberies of three check cashing stores in Englewood, Parsippany and South River, New Jersey that occurred between September 1, 2001 and November 9, 2001. Defendant's alleged role in the robberies, during which firearms were brandished and the stores' employees were threatened and physically assaulted, was "organizer, planner [and] provider of equipment" (including weapons).  Hearing Transcript, October 23, 2006 ("Oct. 23 Tr.") at 88. Defendant also is alleged to have acted as a look-out outside of the premises during the robberies. *Id.*  Approximately $240,000 was stolen in these incidents.  All of Defendant's alleged co-conspirators have entered guilty pleas to various charges arising from these incidents and are serving their sentences.

    After the New Jersey robberies took place, but before the indictment was returned in this case, Defendant pled guilty in the Delaware Superior Court to charges arising from three robberies committed in that state in 2002.  On December 5, 2003, defendant was sentenced in Delaware to 36 years incarceration (that is suspended after 26 years incarceration), followed by probation.

    Defendant's trial on the instant charges was scheduled to begin on December 2, 2004.  On December 1, 2004, a jury was selected.  However, the next morning, before the jury had been sworn in, Defendant's counsel, David Glazer, an experienced defense attorney, advised the Court of his concern that his client was not competent to stand trial.  Counsel's concern stemmed in part from Defendant's behavior during jury selection the previous day, when Defendant interrupted the proceedings several times to make irrelevant statements or inquire into irrelevant

legal issues.[1]  Mr. Glazer also advised the Court that he observed what appeared to be a deterioration of his client's mental state over the previous two months, and as a result counsel was getting little, if any, assistance from Defendant in preparing a defense.  Additionally, Mr. Glazer stated that he had recently learned, based on documents turned over by the government on the previous day, as well as his discussions with both Defendant and his mother, that Defendant had been admitted to a mental institution at some point in his life.  Based on counsel's representations as well as the Court's own observation of Defendant's behavior, the Court ordered a continuance to permit Defendant to undergo a psychiatric evaluation.[2]

Defendant was initially evaluated by psychiatrist Richard G. Dudley, Jr., M.D., who issued a report dated January 7, 2005 ("Jan. 7 Report").  Dr. Dudley found Defendant to have "significant cognitive difficulties," possibly present since birth and/or as a result of a severe car accident Defendant was involved in when he was fifteen years old.  Jan. 7 Report at 13.  As a result of these cognitive difficulties, Dr. Dudley stated that Defendant is unable to adequately understand what is going on at "important points" in the case and therefore becomes easily overwhelmed and paranoid.  According to Dr. Dudley, Defendant also suffered Posttraumatic Stress Disorder ("PTSD") after the car accident, and as such he is even more likely to become paranoid under stress.  The report concludes that "as a result of [Defendant's] neuropsychiatric difficulties, he is currently unfit to proceed with this matter."  Jan. 7 Report at 14.  Dr. Dudley recommended that defendant be placed in a forensic psychiatric facility for further evaluation.

---

[1]The particulars of Defendant's behavior are reflected in the record of the proceedings on December 1, 2004.

[2]The Court's decision and order in this regard was placed on the record on December 2, 2004.

On January 18, 2005, the Court ordered further psychiatric evaluation of the Defendant to be conducted at a federal correctional facility.  The Defendant was subsequently assessed at the Metropolitan Correctional Center in New York by psychologist William J. Ryan, Ph.D., who issued a report dated June 2, 2005 ("June 2 Report").  Dr. Ryan reported that Defendant suffered from PTSD and psychotic disorder, as well as mild mental retardation.  Dr. Ryan concluded that Defendant was not competent to stand trial due to "significant limitations in competency from both mental illness (*i.e.*, paranoid delusions) and mental defect (*i.e.*, mental retardation)."  *See* June 2 Report at 8.

On July 26, 2005, the Court held a hearing at which Dr. Ryan testified and determined that Defendant suffered from a mental disease or defect that rendered him incompetent to stand trial.  The Court ordered that Defendant be transferred to a hospital facility for treatment and further evaluation.  *See* August 1, 2005 Order.  On August 24, 2005, Defendant was admitted to the Federal Medical Center located in Butner, North Carolina ("FMC Butner").  In a report dated January, 31, 2006, ("Jan. 31 Report") psychologist Edward E. Landis, Ph.D. and psychiatrist Ralph Newman, M.D., advised that after a four-month evaluation period, the staff at the medical center was unable form a definitive opinion as to Defendant's competency to stand trial.  It was noted that Defendant refused to cooperate with the evaluation process and at times refused to speak to evaluators at all.  He refused to complete psychological testing.  It was further noted that the evaluation of Defendant was also complicated by "a dearth of detailed, objective history." Jan. 31 Report at 6.  The report recommended an additional 120-day evaluation period.

The Court ordered the additional period of evaluation at FMC Butner.  In a report dated July 17, 2006 (the "July 17 Report"), Dr. Landis and Dr. Newman concluded that Defendant was

incompetent to stand trial.  According to Dr. Landis, the evaluation of Defendant during his two admissions at FMC Butner consisted of (1) attempts to interview Defendant, to which Defendant was "pretty uncooperative;" (2) observations of Defendant's demeanor and his mental status, from which Dr. Landis states he "didn't derive a whole lot of information;" (3) observations of Defendant's behavior while in the hospital; (4) reviewing the reports from Drs. Dudley and Ryan; (5) reviewing, to the extent available, school and court records; (6) monitoring some of Defendant's phone calls; and (7) a physical exam.  Oct. 23 Tr. at 15, 19.  Drs. Landis and Newman diagnosed Defendant as paranoid and delusional, but opined that there was a substantial probability that treatment with antipsychotic medication would restore Defendant's competency to stand trial.  July 17 Report at 9.  Although the staff at FMC Butner attempted to discuss with Defendant of the benefits of treatment with antipsychotic medications, Defendant expressly refused to take any medication, apparently fearing he would be poisoned.

Subsequently, the government sought the Court's authorization to allow the staff at the Butner facility to involuntarily medicate Defendant in accordance with *Sell v. United States*, 539 U.S. 166, (2003) for the sole purpose of rendering Defendant competent to stand trial.  The Court conducted a hearing in this regard on October 23, 2006, and heard testimony in support of the government's application from Dr. Landis and Special Agent Carrie Brzezinski of the Federal Bureau of Investigation.  Dr. Landis testified with regard to Defendant's psychiatric condition and potential treatments.  Agent Brzezinski testified regarding the circumstances of the robberies underlying the indictment against Defendant.

According to Dr. Landis, Defendant is not competent to stand trial due to his "delusional disorder, antisocial character pathology [and] substance abuse," although Dr. Landis noted that

Defendant may be "malingering in some ways, principally having to do with potential cognitive and intellectual limitations."[3]  Oct. 23 Tr. at 22.  Defendant's diagnoses are part of a family of psychiatric illnesses referred to as "psychotic disorders," that "involve a loss of touch with reality."  *Id.*  Dr. Landis explained that Defendant's delusional disorder causes Defendant to express "fixed, false irrational belief[s] that [Defendant] can't give up and isn't subject to being persuaded out of by the reasonable evidence that most people might accept to prove to them that they're wrong about something."  *Id.* at 43.  Defendant also suffers with paranoia, that is, a feeling of personal fear.  Additionally, based on limited school records that are available, it appears that Defendant may have significant cognitive limitations.  When formally tested at age 12, Defendant had an I.Q. of 70, which, according to Dr. Landis, is traditionally recognized as the boundary between borderline intelligence and mild retardation.  June 2 Report at 3; Oct. 23 Tr. at 50.  Additional information shows that at age 12, Defendant was in residential treatment at a school for mentally retarded children.  June 2 Report at 3.

Dr. Landis testified that treatment for Defendant's psychotic disorder would include the administration of antipsychotic medication.  In the case of a compliant patient, this medication would be administered orally.  In situations where a patient is uncooperative, however, the preferred medication is one that is available in a long-acting injectable form, so as to minimize the number of times the medication would need to be administered.  In the present case, given Defendant's recalcitrance, Dr. Landis explained that the first-line medication to be used would be long-acting Haldol deconate ("Haldol"), which would be injected (forcibly if necessary) once every two weeks for the first two months, then every four weeks thereafter.  Dr. Landis opined

---

[3]"Malingering" means faking or exaggerating symptoms.

that it was substantially likely that treatment with this medication would restore Defendant's

competency, but noted that the medication would not make a difference in Defendant's

intellectual capacity.

      Dr. Landis also testified regarding the potential side effects of drug treatment, which are

also detailed in the July 17, 2006 report from FMC Butner.  Dr. Landis agreed that "[w]hile the

therapeutic benefits of antipsychotic drugs are well-documented, it is also true that the drugs can

have serious, even fatal, side effects."  *See Riggins v. Nevada*, 504 U.S. 127, 134, 112 S.Ct.

1810, 118 L.Ed.2d 479 (1992); Oct 23 Tr. at 56.  Indeed, based on the evidence presented, the

side effects of Haldol can be severe, and include Parkinsonian effects (*e.g.*, rigidity, tremors,

muscle stiffness, shuffling gate, stooped posture), akathisia (described by Dr. Landis as a kind of

restlessness), dystonic reactions (slow, sustained muscular contraction or spasm that can result in

an involuntary movment involving the neck, jaw, tongue, or entire body), tardive dyskinesia

(repetitive tics or movements that typically involve the face, mouth or upper extremities) and in

some cases neuroleptic malignant syndrome, a relatively rare condition that can lead to death

from cardiac dysfunction.   July 17 Report at 7; Oct. 23 Tr. at 57-59.  The likelihood that

Defendant will experience these side effects are as follows: Parkinsonian effects occur in about

15% of patients, acute dystonia occurs in about 10% of patients, tardive dskinesia in 4% per year

with a lifetime prevalence of approximately 30%,[4] and cardiac dysfunction in less than 1% of

patients.  July 17 Report at 6.  Most of these side effects, should they occur, are treated with

medications, which themselves come with a risk of certain side effects.  However, there is no

treatment for  tardive dyskinesia, and even if treatment with Haldol is stopped immediately,

---

      [4]The longer a patient is treated the greater the risk of this side effect.

tardive dyskinesia is irreversible in 50% of cases.  *Id.*

II.  Discussion

A prisoner has a constitutionally protected Fifth and Fourteenth Amendment liberty interest in remaining free from unwanted medical treatment and cannot be forced to accept medication without due process of law.  *See Washington v. Harper*, 494 U.S. 210, 221, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990) (recognizing "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs").  Indeed, the Supreme Court has noted that an individual's "interest in avoiding the unwarranted administration of antipsychotic drugs is not insubstantial.  The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."  *Id.* at 229.  However, this liberty interest may be overridden in limited situations.

In *Sell v. United States*, 539 U.S. 166, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003), the Supreme Court addressed the issue of whether the forced administration of antipsychotic drugs to render a pre-trial detainee competent to stand trial unconstitutionally deprives a defendant of his or her "liberty" to reject medical treatment.  The Court, relying on its opinions in *Riggins v. Nevada*, 504 U.S. 127, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992) (holding that an individual has a constitutionally protected liberty "interest in avoiding involuntary administration of antipsychotic drugs"-- an interest that only an "essential" or "overriding" state interest might overcome) and *Harper*, 494 U.S. at 221-222 (recognizing that an individual has a "significant" constitutionally protected "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs") concluded that in certain circumstances the Constitution permits the government to forcibly medicate a mentally-ill defendant solely to render that defendant

8

competent for trial.  However, the Court noted that such instances may be "rare."  *Sell*, 539 U.S. at 180.

In accordance with *Sell*, a court may order the involuntarily medication of a defendant for trial competency purposes if a court finds the following:  (1) important governmental interests are at stake; (2) involuntary medication will significantly further those concomitant state interests; (3) involuntary medication is necessary to further those interests, specifically, the court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results; and (4) administration of the drugs is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition.  539 U.S. at 180-81.  The Supreme Court is silent on what standard applies in evaluating these factors, and the Third Circuit has likewise not addressed the question.  Other circuit courts have found the clear and convincing standard to be applicable.  *See United States v. Gomez*, 387 F.3d 157, 160 (2d Cir.2004); *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir.2005).  Given the importance of the Constitutional interest at issue, this Court finds it appropriate to apply the clear and convincing standard.

As an initial matter, it is important to note that the *Sell* factors only control when the sole purpose of the medical treatment is to render the defendant competent to stand trial.   The Supreme Court has cautioned that if the forced medication is warranted for other purposes, a court does not have to consider whether to allow forced medication for the purpose of rendering a defendant competent to stand trial.  *Sell*, 539 U.S. at 181-82.  Therefore, the threshold issue[5] in

---

[5]The *Sell* Court advised that "a court, asked to approve forced administration of drugs for purposes of rendering a defendant competent to stand trial, should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on these other *Harper*-type grounds; and, if not, why not."  539 U.S. 183.

a case such as the present "is whether the forced treatment is justified for other reasons, such as those 'related to [the defendant's] dangerousness, or . . . where the refusal to take drugs puts [the defendant's own] health gravely at risk." *United States v. Gomes*, 387 F.3d 157,160 (2d Cir. 2004) (quoting id.). *See also Milne v. Burns*, 2005 WL 2044912, No. 97-2061 (D.N.J. 2005) (finding *Sell* not applicable where medication was not administered for the purpose of restoring competency for trial).

The government does not contend that forced medication in this case is justified for any other purpose. Indeed, as set forth in the July 17 Report, Defendant's "treatment team is of the uniform opinion that he neither presents an imminent (as in his current state of incarceration) danger to himself, others or the property of another, nor is he gravely disabled." July 17 Report at 9. Consequently, the Court finds that the factors set forth by the Supreme Court in *Sell* control in this case. The Court shall address each of these factors in turn.

1. Governmental Interests

Under the first factor of the *Sell* test, the government must show that important governmental interests are at stake. The Government correctly points out that the *Sell* Court specifically found that "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important." 539 U.S. at 180. Although the Supreme Court offers no guidance on how to determine whether a crime is "serious," Defendant here does not dispute that the offenses charged are serious. Indeed, the offenses charged are violent offenses that carry severe penalties. Four of the five counts in the indictment against Defendant carry a maximum of twenty years incarceration, and the fifth count carries a mandatory minimum sentence of seven years, which must run consecutively to any other term of imprisonment Defendant may receive.

10

As such, the Court finds that the offenses charged against Defendant are serious.  *See United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005) ("[I]t is appropriate to focus on the maximum penalty authorized by statute in determining if a crime is 'serious' for involuntary medication purposes.)

The Supreme Court has cautioned, however, that courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution" because "[s]pecial circumstances may lessen the importance of that interest."  *Id.*  For example, the Court noted that

> [t]he defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally-ill and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime.

*Id.*  Other special circumstances noted by the Court as examples included the possibility that (1) evidence may become stale due to passage of time, (2) the defendant may have served a substantial portion of his eventual sentence, and (3) the forced medication may compromise the defendant's guarantee of a fair trial.  *Id.*

In various situations, courts have found that the existence of "special circumstances" diminished the Government's interest enough to prevent forced medication.  *See, e.g.*, *U.S. v. Schloming*, 2006 WL 1320078 (D.N.J. 2006) (Government's interests diminished where (1) time served plus time to regain competency could result in incarceration longer than potential sentence; and (2) likelihood of Defendant reentering society unmedicated was low because of possibility of civil commitment.); *United States v. Rodman*, 2006 U.S. Dist. LEXIS 62462 (D.S.C. 2006) (Government's interest is significantly diminished because Defendant has already been confined for almost the entire term to which he would be sentenced under the Sentencing

Guidelines if convicted.).  Likewise, the Court finds that in the instant case there are special circumstances that exist to lessen the importance of the Government's interest in bringing Defendant to trial.

First, Defendant is presently serving a lengthy confinement in Delaware state prison.  The *Sell* Court stated that, while not totally undermining the Government's interest, the potential for future confinement affects the strength of the need for prosecution.  539 U.S. at 180.  Although the Supreme Court's discussion of "future confinement" in *Sell* referred to civil commitment, this Court finds that application of the principle is equally appropriate to criminal incarceration. Defendant is a 48 year-old man presently subject to a 36-year sentence in Delaware that includes 26 years of imprisonment followed by probation.  As such, even if Defendant is never convicted of the current charges, Defendant will serve most of the rest of his life in prison.  Consequently, the "risks that ordinarily attach to freeing without punishment one who has committed a serious crime" are virtually nonexistent in this case.  *See id.*

Second, there can be no dispute in this case that the crimes at issue have been completely solved.  Three of the four perpetrators have been convicted and sentenced for these crimes and Defendant himself has been convicted and sentenced for a related crime.  Therefore, it can be said that all have been substantially brought to justice in one way or another.

Third, the robberies at issue occurred over five years ago, and the victims of these crimes continue to wait to be called as witnesses at trial in order to recount the traumatic events of those days.[6]  If the Court were to order that Defendant be forcibly medicated, it will be many more

---

[6]According to the government, none of the victims can identify Defendant as a perpetrator because Defendant allegedly acted as a look-out outside the premises.  Consequently, the victims will be testifying primarily regarding the acts of the co-defendants and the resulting trauma the

12

months (or longer) before it is known whether Defendant may ever actually become competent to stand trial,[7] and therefore, if a trial were to eventually take place in this case, it would not happen for quite some time.  The Court recognizes that the victims of these crimes have an interest in the eventual resolution of this matter and in being able finally to put their traumatic experience[8] completely behind them.  Special Agent Brzezinski, who has spoken with the victims as recently as four months before her testimony on this motion, stated that in her opinion the victims in this case "want it to be over one way or another."  Oct. 23 Tr. at 91.  In light of the amount of time that has passed since the crimes occurred and the length of time it may take to ultimately bring this case to trial, the Court considers the interest of the victims to have a final resolution of the case to weigh, in part, against the government's interests here.

In light of the above, the Court finds that "special circumstances" in this case have diminished the government's interest in trying Defendant.  The Court finds, therefore, that the government has not met its burden as to the first factor set forth by the Court in *Sell*.

---

victims suffered, physical and/or psychological.

[7]Dr. Landis testified that the typical evaluation period to determine whether the treatment is working is four months.  Oct. 23 Tr. at 31.  At that point, according to Dr. Landis, Defendant (1) may  be showing no progress, at which point it may be determined that further treatment is not warranted; (2) may be restored to competency, at which point he would be scheduled for trial; or (3) may fall somewhere in the middle and treatment may be continued in an attempt to fully restore competency.  *Id.*

[8]As described by Agent Brzezinski, one was victim was so terrified in the aftermath the incident that when she was home without her husband she would run to another part of her house anytime her doorbell rang or someone knocked.  According to Agent Brzezinski, this victim's young children now believe that the proper response to a knock on the door is to run away from the door.

2.  Furthering Government Interests

The second factor requires the government to establish that involuntary medication will significantly further the government's interests in the case.  539 U.S. at 181.  Specifically, a court "must find that administration of the drugs is substantially likely to render the defendant competent to stand trial [and] [a]t the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair."  *Id.*

With respect to this factor of the *Sell* test, the Government points to the July 17, 2006, report of Dr. Landis and Dr. Newman, which concluded that it is "substantially likely" that Defendant will be restored to competency through the administration of antipsychotic medication.  The report estimated there was an eighty percent chance that the medication would be efficacious.[9]  *See United States v. Algere*, 396 F. Supp. 2d 734, 741 (E.D. La. 2005) (citing *Gomes*, 387 F.3d at 161-62 (seventy percent chance that defendant is restored to competency meets "substantially likely" standard); *United States v. Morris*, 2005 U.S. Dist. LEXIS 38791 at *3 (D. Del. Feb. 8, 2005) (same); *United States v. Ghane*, 392 F.3d 317, 320 (8th Cir. 2004) (five to ten percent chance of restored competence not a substantial likelihood).  While the Court finds the experts in this case to be entirely credible, the Court is not satisfied that the conclusion that Defendant will be restored to competency meets the clear and convincing standard.

Dr. Landis explained that in evaluating a particular patient's likely response to treatment with antipsychotic medication, there are certain factors that are associated with better outcomes

---

[9]Dr. Landis did testify that in the collective experience at FMC Butner, over a "long period of time leading up to the arguments in *Sell*," nearly eighty percent of patients treated were restored to competency.  Oct. 23 Tr. at 36.

(*i.e.*, positive prognostic signs) and there are certain factors that are associated with undesirable outcomes (*i.e.*, negative prognostic signs). Oct. 23 Tr. at 44.  According to the July 17 Report as well as the testimony of Dr. Landis, the positive prognostic signs for Defendant include (1) the absence of severe "deficit symptoms" (*e.g.,* a lack of self-care); (2) the lack of disorganized behavior; and (3) adequate premorbid functioning, *i.e.*, adequate functioning prior to the onset of his condition.  July 17 Report at 4.  Negative prognostic signs include the duration of time Defendant has been untreated, as well as the presence of substance abuse in Defendant's history.

Thus, in reaching his conclusion that it was "substantially likely" that Defendant would be restored to competency, the doctor necessarily relied upon the fact that Defendant had "adequate premorbid functioning."  However, Dr. Landis conceded that information about Defendant's mental status or lifestyle during his adult years prior to his admission to FMC Butner was scant or nonexistent.  Dr. Landis testified that he knew little about the Defendant's activities over the past 20 years other than that Defendant was "mainly serving jail time."  Oct. 23 Tr. at 47.  However, the staff at Butner were unable to obtain Defendant's jail records, and no one contacted any of Defendant's family to find information regarding Defendant's past mental condition.  Further, with respect to any period of time that Defendant was not serving jail time, Dr. Landis conceded that he had no information about Defendant's circumstances -- whether Defendant was working, going to school, or even living on the street.  Oct. 23 Tr. at 47. Therefore, in addition to it being unclear exactly how long Defendant has suffered and gone untreated (a negative prognostic sign), whether Defendant had "adequate premorbid functioning," a key factor in assessing the likely effectiveness of the medication, is certainly far from clear on the record in this case.

15

Additionally, it is important to keep in mind the standard for determining competency to stand trial. "A defendant is competent to stand trial if (1) the defendant has the present ability to consult with [defense counsel] with a reasonable degree of rational understanding and (2) the defendant has a rational as well as factual understanding of the proceedings." *U.S. v. Leggett*, 162 F.3d 237, 242 (3d Cir. 1998) (internal quotations omitted, alterations in original). Each of the experts that evaluated Defendant noted that Defendant suffered from cognitive deficits, possibly even mild mental retardation. Dr. Landis testified that the proposed antipsychotic medication will not improve this condition. Therefore, a question remains as to what degree of competency could be achieved even if Defendant's psychosis is treated successfully.

Last, in his initial evaluation of Defendant, Dr. Dudley had stated that an evaluation of Defendant by a neuropsychologist or a neurologist would have been helpful. Dr. Landis also stated that it would have been a "preferred step" in the evaluation process for Defendant to undergo brain imaging or a neuropsychological examination which would have explored whether Defendant had structural abnormalities in his brain or brain damage. Oct. 23 Tr. at 67. However, because of the extensive cooperation by a patient required to complete such testing, it was not done with Defendant. That leaves unresolved the question of whether there may be some physical problems that are affecting Defendant's competency.

With respect to the potential side effects of the drug treatment, the July 17 Report, as discussed above, details the litany of possible side effects, some serious. The report states, however, that because side effects will be monitored and minimized to the extent possible by changes in dosage or with additional medications, "the proposed treatment would be substantially unlikely to have side effects that will interfere significantly with [Defendant's] ability to assist

16

counsel in conducting a defense."  Nevertheless, in light of the Court's findings above, the Court finds that the Government has not met its burden to establish by clear and convincing evidence the second factor required under *Sell.*

## 3.  Necessity of Involuntary Medication

The third factor set forth in *Sell* focuses on the involuntary nature of the administration of the medication treatment and requires the Court to evaluate the necessity of forced medication.  It requires a finding that "any alternative, less intrusive treatments are unlikely to achieve substantially the same results."  539 U.S. at 181.  Furthermore, before ordering the forced administration of medication, the Court must also "consider less intrusive means for administering the drugs, *e.g.*, a court order to the defendant backed by the contempt power, before considering more intrusive methods."  *Id.*

The July 17 Report concludes that absent treatment with antipsychotic medication, Defendant will not be returned to competency in the foreseeable future.  July 17 Report at 9. Although there are non-drug therapies such as counseling that would be part of Defendant's treatment program even if he were treated with medication, *see* Oct. Tr. at 35,  there appears to be no dispute that such therapies alone would not achieve substantially the same result as treatment with medication.  Defense counsel, however, argues that before permitting the forcible administration of medication, the Court should consider issuing an order directing Defendant to comply with further testing or treatment.  *See* 539 U.S. at 181*; see also United States v. Colon*, 03 Mag. 1328, 2003 U.S. Dist. LEXIS 12804 at * 13 n.1 (S.D.N.Y. 2003) (recognizing that "[t]he *Sell* decision directly refers to a court order to a defendant to take medicine as being a less intrusive means for administering drugs than involuntary administration of medication.").

17

Given the Court's other findings in this opinion, it is not necessary to reach Defendant's argument. Nevertheless, the Court notes that given Defendant's condition, entry of such an order is not a practical alternative. It appears that Defendant would not completely understand the nature of such an order, and, in particular, the consequences of his failure to follow it. This undermines the very purpose of issuing an order "backed by the contempt power." *See* 539 U.S. at 181.

4.  Medical Appropriateness of Treatment

The last factor in *Sell* requires the Court to find that "administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition." 539 U.S. at 181 (emphasis in original). "The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Id.* For the same reasons discussed above regarding whether the administration of medication furthers the government's interests, the Court finds that the Government has not clearly and convincingly shown that the administration of antipsychotic drugs are in the Defendant's best interest. Simply put, there are open questions regarding certain issues that bear on the ability of medical professionals in this case to evaluate the potential effectiveness of antipsychotic medications on Defendant. Additionally, the risk of Defendant suffering serious side effects is not insubstantial. When the risks of serious side effects are balanced against the questions that exist affecting the potential effectiveness of drug treatment, the Court cannot conclude by clear and convincing evidence that the potential benefits that outweigh the substantial risks.

III.  Conclusion

Having considered the factors set forth by the Supreme Court in *Sell*, the Court finds that the government has not met its burden of establishing all of the necessary factors by clear and convincing evidence.  Defendant's liberty interest in refusing medical treatment is substantial, and the government has not made the required showing to override that interest.  Consequently, for the reasons set forth above, the government's motion is denied.[10]

/s/ JOEL A. PISANO
United States District Judge

Dated: January 23, 2007

.

---

[10]In light of the Court's decision, it is unlikely that Defendant will ever be tried on the current charges.  Thus, Defendant's immediate future will take one of two paths.  There is the possibility that Defendant may be subject to civil commitment pursuant to 18 U.S.C. § 4246 (applicable to prisoners "presently suffering from a mental disease or defect" and whose "release would create a substantial risk of bodily injury to another person or serious damage to property of another.").  If civil commitment is inappropriate, Defendant will be returned to serve the remainder of his state court sentence in the State of Delaware, where, the Court has been informed, the prison system is equipped to accommodate the mental health needs of prisoners such as Defendant.